OPINION OF THE COURT
James A. Yates, J.
Petitioners Marc Odrich and Steven Odrich are New York licensed physicians, and board certified ophthalmologists who *121 held faculty appointments at respondent Columbia University’s College of Physicians and Surgeons from 1992 and 1993, respectively, through June 30, 2001. In conjunction with their status as faculty members, they were afforded hospital privileges at New York-Presbyterian Hospital. Respondents have terminated petitioners’ faculty appointments and hospital privileges because of their refusal to pay a “Dean’s Tax” of 10% of all their practice income, from whatever source derived, to the school’s faculty practice plan. Half of this assessment is paid to the department of ophthalmology to further its programs and the other half is paid to the dean of the medical school to be used, in the dean’s discretion, to further programs within the school. Petitioners complain that the demanded “tax” constitutes an illegal fee-splitting arrangement under Education Law § 6531.
Background
From 1992-1993 to March 1998 petitioners held part-time faculty appointments at the medical school while engaging in private practice in Riverdale, New York. As such, they participated in the clinical teaching program, without salary or employment benefits, and enjoyed hospital privileges. During this time, their part-time faculty appointments were continuously renewed and they were not required to pay a Dean’s Tax.
In March 1998, the petitioners joined the full-time faculty of the College of Physicians and Surgeons of Columbia University. Petitioners were each appointed to the position of assistant professor of clinical ophthalmology which carried certain teaching, research and administrative duties and responsibilities to the school and required performance of clinical services as well. They gave up their private practice. The terms of their employment were specified in a letter, dated March 10, 1998, signed by Stanley Chang, chair of the department of ophthalmology. The school purchased certain equipment from petitioners and, according to the letter agreement, assumed responsibility for the lease to their office as well as the expenses of their practice, including overhead and salaries for their support staff. They were paid a salary with a fixed minimum base salary as well as a “clinical bonus.” The salary, consisting of a base pay of $40,000 and a “clinical supplemental” of $110,000 to Marc Odrich and $135,000 to Steven Odrich, included compensation for both teaching and clinical *122 assignments. Petitioners received fringe benefits and were included in the school’s health and pension plans. All income derived from their practice was billed through, and collected by, the University according to its own fee schedule.
The arrangement was viewed by the parties as being mutually beneficial since, “The Medical School benefitted by gaining an off-site clinical location for its teaching program; and Petitioners benefitted by their promotion to full-time faculty with guaranteed incomes, financial development of their practice by the Medical School, and the absence of financial risk.” (Respondents’ answer, Thomas Q. Morris affidavit, dated Jan. 23, 2002, 3.)
While working as full-time faculty members and practicing through the clinic, a “Dean’s assessment of 5% and a Departmental assessment of 5% of gross revenues from clinical services” was paid to the college. (Verified petition, exhibit C, letter agreement, dated Mar. 10, 1998, at 2, 4.)
At the time of petitioners’ move to full-time association with the school, the ophthalmology department was in the process of forming a faculty practice plan. (See Not-For-Profit Corporation Law § 1412.) As such, the March 10th agreement provided for an expiration on October 1, 1998 or earlier, upon execution of superseding documents with the anticipated establishment of a practice plan, Columbia Ophthalmology Consultants (COC). Somewhat incongruously, the letter agreement also provided that petitioners had the right to “resume [their] former relationship with the University and the Department” if they left the full-time faculty within the “first two years of this agreement.” (Verified petition, exhibit C, letter agreement, dated Mar. 10, 1998, at 2,1} 5.)
COC was incorporated in July 1998 as a university faculty practice corporation. Although no new documents were executed by the parties, the arrangement with the department continued, but control of the clinical practice was assumed by COC, apparently on the same terms as specified in the March 1998 letter agreement. In accordance with the parties’ understanding, petitioners were reappointed to full-time faculty positions for the year July 1, 2000 to June 30, 2001. (Verified petition, exhibit F, appointment letters from R. Keith Walton, secretary to the University, to petitioners, dated Sept. 13, 14, 2000.)
In the fall of 2000, a little more than two years after petitioners had joined COC, the parties made arrangements for petitioners to resign from the plan and to resume private *123 practice. Patients were to be advised of the separation and given their choice to continue to be treated by either petitioners or COC. Petitioners repurchased the assets and equipment of their practice for approximately $140,000. As well, they reassumed responsibility for the remaining term of the lease to their office space — due to expire in September 2003.
Petitioners expressed a desire to continue affiliation with the school and the hospital. There is a disagreement about what, if anything, was understood by the parties in this regard. On October 26, 2000, petitioners each wrote to respondent Chang who serves as both chair of the department and president of COC: “Please accept my resignation from Columbia Ophthalmology Consultants effective January 1, 2001. Please note that I would like to continue practicing ophthalmology at Columbia University and remain a member of the Columbia Faculty.” (Respondents’ answer, exhibits 4, 5, resignation letters, dated Oct. 26, 2000.)
On February 6, 2001, in a letter signed by Dr. Chang and respondent Thomas Q. Morris, interim dean of the college, Steven Odrich was advised:
“At your request and as an exception to University policy, your full-time faculty appointment was changed to a part-time appointment, effective January 1, 2001. The reason for the exception is that you are a glaucoma specialist and your experience and abilities, which are needed to train residents and fellows, as well as to care for certain patients of the Department’s clinical practice, are not covered by other faculty members of the Department at this time.”
By letter of the same date, Marc Odrich was told:
“At your request and as an exception to University policy, your full-time faculty appointment was changed to a part-time appointment, effective January 1, 2001. The reason for the exception is that you have become the Medical Director of VISX, Inc. and you will be devoting most of your time to the company.”
In the same letters, both petitioners were advised:
“You will provide such teaching, research and administrative duties and responsibilities as shall be assigned to you from time to time by the Dean of the Faculty of Medicine and the Department Chair. * * *
*124 “You will not receive salary or fringe benefits from the University while you hold a part-time appointment, and you will not be entitled to use doctors’ private office space at University for your practice.”
As well, the letters provided that: “This exception is conditioned upon your agreement that all your practice fee income, wherever generated, will be included in the Department’s Faculty Practice Plan and subject to the Departmental Contribution, in the same manner as the practice fee income for other Faculty Practice Plan members.”
Apparently the February 6th letter generated further discussion and a meeting on April 16, 2001 between the parties. On April 30, 2001 respondents Chang and Morris sent a new letter “to modify the letter sent to you on February 6, 2001, concerning your appointment to the faculty in the Department of Ophthalmology.” (Verified petition, exhibit H, letter sent by respondents Stanley Chang and Thomas Q. Morris to petitioners, dated Apr. 30, 2001, at 1, 1.) The letters are similar but contain additional explanations of the decision to make an “exception” because of “your close connection with the College of Physicians and Surgeons and the Department of Ophthalmology, beginning with your training here, and your subsequent contributions to the Department.” (Id. jj 2.)[1]
Regarding office space, both were further advised, “For your clinical practice, you may use outpatient faculty practice space assigned to the Department at the Eye Institute and at Columbia-Presbyterian Eastside, subject to availability and the approval of the Chair.” (Id. 3.)
As with the February 6th letters, the April 30th letters declared that the exception was conditioned upon an agreement that all practice income, wherever generated, would be subject to the departmental contribution. When petitioners refused to sign the April 30th agreement, their faculty appointments were terminated, effective June 30, 2001. On August 2, 2001 they were advised that their application for renewal of hospital privileges was not approved because it had not been forwarded from the University to the hospital — a prerequisite for continued access to the hospital. (Verified petition, exhibit K, letter from Maxine Fass, senior vice-president, New York-Presbyterian Hospital, to David A. Zarett, Esq., dated Aug. 2, 2001.)
*125 Fee-Splitting
Education Law § 6530 (19) defines professional misconduct for physicians as including:
“Permitting any person to share in the fees for professional services, other than: a partner, employee, associate in a professional firm or corporation, professional subcontractor or consultant authorized to practice medicine, or a legally authorized trainee practicing under the supervision of a licensee. This prohibition shall include any arrangement or agreement whereby the amount received in payment for furnishing space, facilities, equipment or personnel services used by a licensee constitutes a percentage of, or is otherwise dependent upon, the income or receipts of the licensee from such practice, except as otherwise provided by law with respect to a facility licensed pursuant to article twenty-eight of the public health law or article thirteen of the mental hygiene law.”
As well, Education Law § 6531 calls for license revocation or suspension upon a finding
“[t]hat any person subject to the above-enumerated articles has directly or indirectly requested, received or participated in the division, transference, assignment, rebate, splitting, or refunding of a fee for, or has directly requested, received or profited by means of a credit or other valuable consideration as a commission, discount or gratuity, in connection with the furnishing of professional care or service * * * .” (See also 8 NYCRR 29.1 [b] [4].)
Respondents contend, in part, that the proposed arrangement in this case is legal because a hospital run by a medical school is organized for the provision of medical care and treatment to patients and that sharing of fees with a medical school is exempt from the prohibitions of the Education Law. (Albany Med. Coll. v McShane, 66 NY2d 982 [1985].)
It is true that one reason for the ban against fee-splitting is the ethical concern that a person or corporation not licensed to practice medicine, but who shares in the provision of services, will improperly influence the professional judgment of the treating physician (see e.g. United Calendar Mfg. Corp. v Huang, 94 AD2d 176 [2d Dept 1983]). If this alone were the motivation for the ban, an arrangement between professional providers might not be illegal (see also Practice Mgt. v Schwartz, 256 Ill App 3d 949, 628 NE2d 656 [1st Dist 1993]).
*126 However, fee-splitting raises ethical problems even when the parties to the arrangement are each authorized to practice medicine. For one,
“It is immaterial whether the division of medical fees occurs between a physician and a layman, or a physician and a physician * * * or, between a physician and a hospital. * * * Inevitably such a method of division would lead to deterioration in the medical staffs of hospitals with attendant injury to the public. It would likewise subject some physicians to the temptation of overcharging their patients in order to meet the requirements of the hospital rule.” (Matter of Sterne, 147 Misc 59, 61-62 [Sur Ct, NY County 1933].)
New York courts uniformly hold fee-splitting arrangements to be illegal, even when the division is between medical providers. (Hauptman v Grand Manor Health Related Facility, 121 AD2d 151 [1st Dept 1986]; see also United Calendar Mfg. Corp. v Huang, 94 AD2d 176 [2d Dept 1983]; Hartman v Bell, 137 AD2d 585 [2d Dept 1988]; Sheldon Rabin, M.D., P.C. v Hirshfield, 223 AD2d 535 [2d Dept 1996].)
The Education Law allows for certain specified fee-splitting arrangements, not applicable here. Section 6531 exempts physicians who share fees as “partners, in groups or as a professional corporation or as a university faculty practice corporation.” (Education Law § 6531.) Accordingly, the fee arrangement between COC, a duly incorporated faculty practice corporation, and petitioners from July 1998 to January 2001 was legal. Respondents have submitted balance sheets for those years, indicating “deficits” presumably owed at one time to COC.[2] (Respondents’ answer, exhibit 3, schedule of individual deficits as of Nov. 30, 2001.) To the extent that a claim is made for a division of fees earned or for services rendered while petitioners were members of the plan, payment would be proper. (Psychoanalytic Ctr. v Burns, 46 NY2d 1002 [1979].) However, the proposed arrangement contained in the February 6th and April 30th letters calls for splitting fees in the future, after they had severed all ties with COC.
As in Hauptman, although “[t]he statute permits fee splitting among fellow physicians who voluntarily enter into a professional corporation [,] [p]laintiff in the instant case is not a *127 member of the professional corporation but is an independent doctor who alleges that he would be forcibly conscripted into the corporation at the price of surrendering [a percentage] of his fees against his will. This does not constitute the sharing of fees among fellow members of a group which is contemplated by Education Law § 6509-a.” (See Hauptman, 121 AD2d at 154.) (Education Law § 6509-a is the predecessor to the current prohibition.)
Respondents mistakenly rely upon McShane, as permitting fee-splitting between a physician and facility operated by a medical school. McShane however was a faculty member who performed services and earned income through the school’s clinic. The fees which were collected by the school were those which were “generated by [its] clinical practice, with the balance retained by the College to cover support staff, maintenance, insurance, and other College expenses.” (Plaintiff-respondent’s brief to the Court of Appeals at 4; Albany Med. Coll. v McShane, 66 NY2d 982 [1985].) The opinion in McShane put to rest a claim that a medical school was unauthorized to practice medicine and, thereby, could not collect or share in the collection of patient fees. McShane stands for the unremarkable proposition that physicians may collectively practice through a clinic run by a medical school. As such, they are permitted to pool resources and income. In fact, in the case before the court, petitioners participated as faculty members in a shared clinical practice with the college from March 1998 until formation of COC in July 1998. Sharing fees and paying a Dean’s Tax during those months was permitted by McShane and neither side has contended otherwise.
The parties here agree that McShane is a common-law exception to the statute based on policy grounds and an acceptance of almost universal practice by medical schools in New York[3] —notwithstanding a lack of explicit statutory authorization. Interestingly, in the wake of McShane the Legislature amended the Education Law to exempt faculty practice plans, but did not similarly endorse the exemption for medical schools created by the Court in McShane. (Education Law § 6531, as added by L 1991, ch 606, § 18; as amended by L 1993, ch 555, § 9.) Assuming, nonetheless, that McShane still reflects the *128 will of the Legislature, the question arises whether the opinion in that case can be read so broadly as to permit all fee-sharing arrangements with medical schools, even where the services provided and the income generated have no connection to the school or its clinical practice. As noted, respondents have demanded a 10% share of “all * * * practice income, wherever generated.”
The record in McShane was far different from the facts in the present case. There,
“The patient care activities of the College are performed by the College’s medical faculty or by medical students or residents under the supervision of the faculty [which included McShane]. All equipment, space, and supplies, and all clerical, secretarial, technical, and other support services in connection with patient care are supplied by the College at its own expense. Significantly, medical malpractice insurance coverage of faculty members engaged in patient care activities is provided by the College.” (Plaintiff-respondent’s brief at 2, *\] 2; Albany Med. Coll. v McShane, 66 NY2d 982 [1985].)
In a case where the treating physician receives no salary or related benefits from the school, has not entered into an agreement to pool resources and share responsibility for patient care, and where the treatment arises out of an arrangement between private doctor and patient at a location completely divorced from the medical school or hospital there is no connective relationship which would justify extending McShane to permit fee-splitting with the medical school or hospital. Simply invoking the mantle of “medical school” as a protective cloak without justification for the protection ignores the policy and reasoning implicit in the McShane decision.
Education Law § 6531 permits a division of fees by professionals who are affiliated in a partnership or corporation. McShane permitted a division of fees between providers (a hospital and a physician) where both assumed responsibility for the patient’s care. Can this be extended to physicians or providers who are not affiliated, but who share in the responsibility for the patient’s care? Presumably so, since each provider is, in essence, being paid by the patient for the care of that patient. (See e.g. Matter of Weiner v Board of Regents, 3 AD2d 113 [3d Dept 1956] [requiring the Board of Regents, in a disciplinary proceeding against a physician, to distinguish between shared fees where there was a division of services, and *129 thereby seemingly acceptable, and shared fees which were merely for referrals, and thereby illegal].) Here, however, the school seeks to stretch McShane one step further yet. The question becomes whether authorized providers may share fees— when they are neither affiliated in a partnership, corporation, or similar organization, nor sharing in the care of the patient— merely because one is a medical school which grants hospital privileges to the physician. According to petitioners, there is no clear New York precedent regarding this proposition because the school’s reach for a share of fees derived from private practice income unrelated to its clinic is unprecedented. Respondents as well concede that this is not a settled practice and, that for some part-time faculty members, no Dean’s Tax is collected.
Looking outside of New York, Illinois law prohibits fee-splitting with other physicians “for any professional services not actually and personally rendered.” (Ill Stat Ann, ch 225, § 60/22 [A] [14] [Smith-Hurd 1987].) As explained there,-
“[T]he Medical Practice Act does authorize physicians who practice in a partnership, corporation, or association to share fees. However, the entities which are permitted to share fees under the Medical Practice Act are those who in return share a correlative responsibility to the patients. It is our view that the Act does not contemplate that a person or entity which abrogates all ongoing responsibility to the patient should nevertheless share in the fees. Accordingly, we see no reason to insulate a transaction of this nature from the fee sharing prohibition of the Medical Practice Act.” (Lieberman & Kraff v Desnik, 244 Ill App 3d 341, 348, 614 NE2d 379, 383 [1993] [condemning a fee arrangement where there was no responsibility of care owed the patient as an illegal “silent partnership”].)
Understandably, “[t]here is a danger that a doctor, knowing that he had to split his fees with one who did not render medical services, might be hesitant to provide proper services to a patient. Conversely, unneeded treatment might be rendered just because of the need to split fees. In either case, the interests of the patient would be compromised.” (E&B Mktg. Enter. v Ryan, 209 Ill App 3d 626, 630, 568 NE2d 339, 342 [1991].) As well, “the judgment of the professional might be compromised, because the awareness that he would have to *130 split fees might make him reluctant to provide proper (but unprofitable) services to a patient, or, conversely, to provide unneeded (but profitable) treatment.” (TLC Laser Ctr., Inc. v Midwest Eye Inst. II, Ltd., 306 Ill App 3d 411, 427, 714 NE2d 45, 56 [1999].)
In a similar context, fee-splitting among lawyers is forbidden. The Code of Professional Responsibility permits fee-splitting only where “[t]he division is in proportion to the services performed by each lawyer or, by a writing given to the client, each lawyer assumes joint responsibility for the representation” (Code of Professional Responsibility DR 2-107 [a] [2] [22 NYCRR 1200.12 (a) (2)]; see also ABA Model Rules of Professional Conduct § 1.5 [e] [1983]). As explained in McCroskey, Feldman, Cochrane & Brock v Waters (197 Mich App 282, 286-287, 494 NW2d 826, 828 [1992]), the rule restricting fee-splitting among lawyers “is designed to prohibit brokering, to protect a client from clandestine payment and employment, and to prohibit aggrandizement of fees.” (Id.)
For the very same policy reasons, McShane’s common-law exception should not be extended to permit a medical school to claim a share of income from an unpaid faculty member’s private practice as a price for the doctor’s access to the hospital facility unrelated to the patient’s care or the school’s responsibility. Respondents’ demand in this case is especially troubling because the proposed arrangement is disconnected from, and disproportionate to, the services provided. (Hauptman, 121 AD2d 151, supra.) As in Hauptman, the proposal is “overreaching” and “indicative of an illegal and unethical fee-splitting arrangement.” (Hauptman, 121 AD2d at 154.) Arguably, the school could demand a split-fee from patients who had in the past, or would in the future, use the school’s or the hospital’s facilities. Similarly, the school and the hospital are free to negotiate a fee or price with petitioners for their use of, or access to, the facilities on whatever terms they may find acceptable. Here, however, the demand is not proportionate, or related in any way, to the patient’s care or the doctors’ access to the facility.
Respondents complain that petitioners profited by their affiliation with the institution as their “practices had expanded tremendously.” (Respondents’ mem of law at 1, 5.) On the other hand, petitioners claim they had a rapidly growing practice which they sacrificed to help Dr. Chang establish COC. (Petitioners’ reply affidavit at 3, j[ 2.) These competing claims may lawfully be addressed by negotiation over payment for use *131 of and access to the facility. Petitioners’ profit does not, however, justify respondents’ claim to a share of fees from future private patients unconnected to the facility. (LoMagno v Koh, 246 AD2d 579 [2d Dept 1998]; Lipsztein v Mount Sinai Hosp., 170 AD2d 285 [1st Dept 1991].) Similarly, respondents also complain that other full-time faculty members will develop practices and leave the school behind. (Id.) If this is so, the school is free to create economic incentives and disincentives, including any form of legal contractual arrangement to keep faculty at the school. Unfortunately, the disincentive they invoke here is an illegal and unduly oppressive arrangement which punishes patients as well as the physician.
Petitioners invoke Hauptman, claiming the proposed arrangement is oppressive and unfair to them. Respondents distinguish Hauptman saying that a 20% tax in that case may have been unfair, but the 10% assessment in this case is not, given the growth of their practice. Both sides have missed the point. The ban on fee-splitting was not created for the purpose of measuring the “fairness” of a contract negotiated at arm’s length between the doctors and the practice plan. It was created to protect patients from inflated billings and clandestine partnerships which have the potential to compromise health care decisions. The parties cannot settle their differences by passing an unjustified cost onto future patients who are not served by the clinic.
Remedy[4]
While respondents’ demand was an illegal one, the question remains as to the appropriate remedy. The school is not required to hire the petitioners as faculty members. As well, the hospital is free to limit access exclusively to members of COC. (Gelbfish v Maimonides Med. Ctr., 184 AD2d 614 [2d Dept 1992].) However, this is not the case presented here. The school does not have an exclusive arrangement with members of the faculty practice plan. It permits private practitioners to continue as part-time faculty members with access to the hospital and clinical facilities. In fact, after Steven Odrich left COC, the school acknowledged that he was “a glaucoma special *132 ist, and [whose] experience and abilities are needed to train residents and fellows, as well as to care for certain patients of the Department’s clinical practice.” (Letters from respondents Stanley Chang and Thomas Q. Morris to petitioners, dated Feb. 6, 2001, at 1.) As such, the school made an affirmative decision to permit petitioners to continue as part-time faculty members and to have access to the hospital facilities.
With regard to the application for hospital privileges, Public Health Law § 2801-b (1) provides that “It shall be an improper practice for * * * a hospital * * * to deny or withhold from a physician * * * professional privileges * * * if the reasons stated are unrelated to standards of patient care, patient welfare, the objectives of the institution or the character or competency of the applicant.” Public Health Law § 2801-c empowers the Supreme Court to enjoin threatened violations of this provision. (See Fritz v Huntington Hosp., 39 NY2d 339 [1976].) There is no claim here regarding “standards of patient care, patient welfare” or “competency” of the applicants. Respondents assert that collection of the Dean’s Tax is a proper practice because it furthers “the objectives of the institution.” This is a bootstrap argument that must fail. To be sure, enhanced revenues which may help support the hospital and medical school are beneficial and thereby “further the objectives of the institution.” That does not mean, however, that the school may bypass ethical and legal proscriptions in pursuit of enhanced revenue. The medical school can and should seek legitimate sources of funding, without demanding payment from patients who have no contact with the school. Fee-splitting is illegal and unethical and cannot be justified by mere invocation of financial need on the part of the hospital. (See Lipsztein v Mount Sinai Hosp., 170 AD2d 285, 286 [1st Dept 1991] [restoring hospital privileges to a doctor over claims of “fiscal responsibility” on a finding that “in balancing the equities, these worthy objectives are overshadowed by the right to continued access to plaintiffs services by his patients and future referrals at Mount Sinai * * * ”].)
Similarly, with regard to petitioners’ termination of their faculty appointments, while deference is due to academic determinations by educational institutions (New York Inst. of Tech. v State Div. of Human Rights, 40 NY2d 316 [1976]), judicial review is authorized where “the challenged determination was arbitrary and capricious, irrational, made in bad faith, or contrary to a Constitutional provision or statute.” (Auguste v New York Hosp. Ctr. of Queens, 260 AD2d 589 [2d Dept 1999] [internal citations omitted].)
*133 Here, it is abundantly clear that the department and the hospital wanted to maintain connection with, and use the services of, petitioners in both their academic and clinical settings. The only reason for the termination of their academic appointments and hospital access was their refusal to comply with an illegal and unethical demand. As well, respondents concede that the Dean’s Tax is not collected from other part-time faculty members who have access to the hospital facilities. As such, the termination was arbitrary, capricious and unlawful. (See Matter of Sanbonmatsu v Boyer, 45 AD2d 249, 254 [2d Dept 2001] [reinstating a part-time teacher upon a finding that “(r)espondents’ decision to deny appellant a term appointment * * * was arbitrary because it was based upon the application of an unlawful discriminatory (antinepotism) rule”].) This is especially troubling in the present case where petitioners quit the faculty practice plan, resigned from the full-time faculty, gave up their salary, fringe benefits, repurchased their private practice and were not forewarned of the additional cost to be exacted. (See Lipsztein, 170 AD2d at 286 [restoring privileges “in light of the serious question of fact as to whether plaintiff was properly apprised of* * * (the) policy at the time * * * ”].)
Petitioners are entitled to a de novo review of their application for renewal of their appointment to the part-time faculty. (Matter of Bennett v Wells Coll., 219 AD2d 352 [4th Dept 1996].) That review should be in accordance with school policy and practice, free of the encumbrance of a wrongful demand for a share of their private practice income. (Matter of Skorin-Kapov v State Univ. of N.Y., 281 AD2d 632, 633 [2d Dept 2001] [“the appropriate remedy is to remit the matter to the appellants for further review of the petitioner’s application” for academic appointment] [internal citations omitted].)
Notwithstanding the likelihood of success on the merits, petitioners’ request for injunctive relief restoring their hospital privileges is premature. Pursuant to Public Health Law § 2801-c, this court is without jurisdiction to enjoin the hospital until the Public Health Council has reviewed the matter and made findings. (Gelbard v Genesee Hosp., 87 NY2d 691 [1996].) Although the court is not bound by the determination of the Public Health Council, their findings are admissible as prima facie evidence of any fact or facts found therein. (Hauptman, 121 AD2d 151, supra.) On the other hand, the hospital has not approved access to the facilities simply because the University has yet to forward the application to the hospital (see verified *134 petition, exhibit K, letter from Maxine Fass, senior, vice-president, New York-Presbyterian Hospital, to David A. Zarett, Esq., dated Aug. 2, 2001). As discussed above, it would be improper for the University to refuse to forward the application solely on the grounds that petitioners refused to engage in fee-splitting with COC or the school. Such refusal is unlawful and discriminatory, and a proper issue for CPLR article 78 relief.
Accordingly, respondents are directed to forward petitioners’ application for hospital privileges to New York-Presbyterian Hospital for consideration by the hospital.

. Beginning more than 20 years ago, petitioners each attended Columbia College as undergraduates, graduated from Columbia College of Physicians and Surgeons and completed their residencies at Columbia-Presbyterian Hospital, now known as New York-Presbyterian Hospital.

. It is unclear from the submissions whether the separation agreement signed by the parties settled any claims for division of fees for services performed while petitioners were members of the faculty plan.

. At the time of the decision in McShane, 12 of New York’s 13 medical schools had a faculty practice plan. Eighty-seven percent of 127 medical schools nationwide also had such a plan (see amici curiae brief of Associated Medical Schools of New York and Association of American Medical Colleges at 2; Albany Med. Coll. v McShane, 66 NY2d 982 [1985]).

. Petitioners filed a grievance with the University Senate, Faculty Affairs Committee a few weeks after their appointment was terminated. The grievance has not been acted upon. By stipulation, so ordered on October 28, 2001, respondents waived any defenses to this action based upon the pendency of the grievance if such grievance was not decided on or before January 7, 2002.